**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JAMES CATTELONA, Derivatively on Behalf of NYFIX, INC., | |
| Plaintiff, | **Case No.**<br>**306CV1320** JBA |
| v. | |
| PETER K. HANSEN, THOMAS C. WAJNERT, GEORGE O. DEEHAN, WILLIAM J. LYNCH, WILLIAM C. JENNINGS, RICHARD Y. ROBERTS, LON GORMAN, ROBERT GASSER, RICHARD CASTILLO and LARS KRAGH, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| and | |
| NYFIX, INC, | **AUGUST 23, 2006** |
| Nominal Defendant. | |

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant NYFIX, Inc. ("NYFIX" or the "Company") against certain current and former officers and/or members of its Board of Directors (the "Board") seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment.

2.      The claims asserted herein arise under federal securities law, and state law for breach of fiduciary duty, unjust enrichment, gross mismanagement, and corporate waste.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United State which it would not otherwise have.

4.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendant's primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

5.      Plaintiff James Cattelona is, and was at all relevant times, a shareholder of nominal defendant NYFIX.

6.      Nominal Defendant NYFIX is incorporated in Delaware, with its principal executive offices located at 333 Ludlow Street, Stamford, Connecticut  06902. According to its public filings, NYFIX is an established provider to the domestic and international financial markets of trading workstations, trade automation and communication technologies and, through its registered broker-dealer subsidiaries, execution services. As of April 12, 2006, the Company has 32.44 million shares of common stock outstanding.

7.      Defendant Peter K. Hansen ("Hansen") is the founder of NYFIX and served as Chief Executive Officer of the Company until November 2005.  He has served as Chairman of the Board from June 1991 until the present.  He is a recipient of backdated stock options.

2

8.      Defendant Thomas C. Wajnert ("Wajnert") has served as a member of the Board of the Company since November 2004.  He has served as a member of the Audit Committee of the Board since 2004.

9.      Defendant George O. Deehan ("Deehan") has served as a member of the Board of the Company since August 2000.  He has served as a member of the Compensation Committee of the Board since 2000.

10.     Defendant William J. Lynch ("Lynch") has served as a member of the Board of the Company since June 2000.  He has served on the Compensation Committee of the Board since 2000.

11.     Defendant William C. Jennings ("Jennings") has served as a member of the Board of the Company since July 2003.  Jennings has also served as the Chairman of the Audit Committee of the Board since 2003.

12.     Defendant Richard Y. Roberts ("Roberts") has served as a member of the Board of the Company since September 2005.

13.     Defendant Lon Gorman ("Gorman") has served as a member of the Board of the Company since September 2005.  He has served as a member of the Audit and Compensation Committees of the Board since 2005.

14.     Defendant Robert Gasser ("Gasser") has served as Chief Executive Officer of NYFIX since November 2005 and as a member of the Board of the Company since 2005.    He served as Chief Executive Officer of NYFIX Millennium since 2001 and President of NYFIX transaction Services and NYFIX Clearing Corporation since their formation. He is a recipient of backdated stock options.

15.     Defendant Richard A. Castillo ("Castillo") served as the Chief Financial Officer of the Company from November 1998 until September 16, 2002.  He is a recipient of backdated stock options.

16.     Defendant Lars Kragh ("Kragh") is the Chief Information Officer of the Company.  He is a recipient of backdated stock options.

3

17.    The Defendants identified in ¶¶7-14 are referred to as the "Director Defendants."  Defendants identified in ¶¶7 and 14-16 are referred to as the "Officer Defendants."   Defendants identified in ¶¶ 9, 10 and 13 are referred to as the "Committee Defendants."   Collectively, the Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  These acts include: 1) agreement to and/or acquiescence in Defendants' option backdating scheme; 2) willingness to cause NYFIX to disseminate false Proxy Statements from 2000-2005, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with NYFIX, each of the Defendants were aware

4

of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to NYFIX shareholders and the financial markets but failed to do so.

20.    Pursuant to Section 162(m) of the Tax Code, 26 U.S.C.§ 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: 1) the compensation is payable solely on account of the attainment of one or more performance goals; 2) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, 3) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and 4) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

21.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

> a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;
>
> c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial

5

information concerning the financial condition of the Company; and

d.    exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

e.    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

22.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)    transactions are executed in accordance with management's general or specific authorization;

(b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

23.    NYFIX's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    Review and discuss with management all of the annual financial statements, quarterly financial statements and internal control reports; and

b.    Review the company's financial reporting processes and internal control structure.

## FACTUAL ALLEGATIONS

24.    Throughout the relevant period, Defendants caused NYFIX to grant them millions of stock options permitting them to buy NYFIX stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Companies usually set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price."  The strike price is usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

25.    At all times relevant hereto, certain of the Company's stock option grants are described below:

**Fiscal 1999 Option Grants**

26.    Defendants dated NYFIX's fiscal 1999 option grants as of April 13, 1999 at $3.00 per share – one of the lowest prices of April and May, 1999.  Defendants Hansen and Kragh received 67,500 and 2,250 options, respectively.  Defendants also dated NYFIX's fiscal 1999 option grants as of August 2, 1999 at $6.945 per share – one of the lowest prices of August and September.  Within days, the stock was trading at $8.30 per share.  The month high for August 1999 was $12.44.  Defendant Castillo received 11,250 options.

**Fiscal 2000 Option Grants**

27.    Defendants dated NYFIX's fiscal 2000 option grants as of January 25, 2000 at $14.75 per share – the lowest price of January and February 2000.  Defendants Hanson and Castillo received 345,000 and 15,000 options respectively.

**Fiscal 2001 Option Grants**

7

28.     Defendants dated NYFIX's fiscal 2001 option grants as of October 23, 2001 at $12.02 per share – the lowest price of October and November 2001. Within days, the stock was trading at $16.30 per share. Defendants Hanson, Castillo and Kragh received 125,000, 25,000 and 25,000 options respectively.

**Fiscal 2002 Option Grants**

29.     Defendants dated NYFIX's fiscal 2002 option grants as of August 15, 2002 at $3.92 per share – one of the lowest prices of August and September 2002. Within a week, the stock was trading at $5.00 per share. Defendants Hanson, Castillo, Kragh and Gasser received 100,000, 20,000, 20,000 and 100,000 options respectively.

30.     During the relevant period, NYFIX's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting were grossly inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated. They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

31.     Specifically, in many instances the reported dates NYFIX stock options were granted differed from the dates on which the options appear to have been actually granted. The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose. In almost every case of misdating, the price of Company's shares on the reported option-grant date was lower than the share price on the actual day the options were issued.

32.    Pursuant to the terms of the Company's stock option plans, the exercise price of options must be no less than the closing price of NYFIX stock on the date of grant.

33.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

34.    In a striking pattern that could not have been the result of chance, nearly each and every one of the foregoing stock option grants was dated just before a substantial rise in NYFIX's stock price.  In addition, with the exception of a few option grants, each of the dates selected was at the lowest price level during the trading week in which the options were granted.

35.    At the behest of the Officer Defendants, the Compensation Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of NYFIX stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

### DISSEMINATION OF FALSE AND MISLEADING FINANCIAL STATEMENTS

36.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

    a.    violated the terms of the Company's shareholder-approved stock
          option plans;

b.      violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.      violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d.      produced and disseminated to NYFIX shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

37.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.      On or about April 3, 2000, the Company filed its Fiscal 1999 Form 10-K with the SEC. The Fiscal 1999 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1999 Form 10-K included NYFIX's Fiscal 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, NYFIX's compensation expense was understated and its net earning were overstated.

b.      On or about April 2, 2001, the Company filed its Fiscal 2000 Form 10-K with the SEC. The Fiscal 2000 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 2000 Form 10-K included NYFIX's Fiscal 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, NYFIX's compensation expense was understated and its net earnings were overstated.

c.      On or about March 29, 2002, the Company filed its Fiscal 2001 Form 10-K with the SEC. The Fiscal 2001 Form 10-K was simultaneously distributed to shareholders and the public. The Fiscal 2001 Form 10-K included NYFIX's Fiscal 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, NYFIX's compensation expense was understated and its net earnings were overstated.

d.      On or about March 31, 2003, the Company filed its Fiscal 2002 Form 10-K with the SEC. The Fiscal 2002 Form 10-K was

simultaneously distributed to shareholders and the public.   The Fiscal 2002 Form 10-K included NYFIX's Fiscal 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, NYFIX's compensation expense was understated and its net earnings were overstated.

e.     On or about May 28, 2004, the Company filed its Fiscal 2003 Form 10-K with the SEC.   The Fiscal 2003 Form 10-K was simultaneously distributed to shareholders and the public.   The Fiscal 2003 Form 10-K included NYFIX's Fiscal 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, NYFIX's compensation expense was understated and its net earnings were overstated.

f.     On or about June 30, 2005, the Company files its Fiscal 2004 Form 10-K with the SEC.   The Fiscal 2004 Form 10-K was simultaneously distributed to shareholders and the public.   The Fiscal 2004 Form 10-K included NYFIX's fiscal 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, NYFIX's compensation expense was understated and its net earnings were overstated.

38.     The materially false and misleading Fiscal 1999-2004 Form 10-Ks described above were reviewed, prepared and/or endorsed by the Defendants.  The Fiscal 1999 Form 10-K was signed by Defendants Hansen and Castillo.  The Fiscal 2000-2001 Form 10-Ks were signed by Defendants Hansen, Castillo, Deehan and Lynch.  The Fiscal 2002 Form 10-K was signed by Defendants Hansen, Deehan, and Lynch.   The Fiscal 2003 Form 10-K was signed by Defendants Hansen, Deehan, Jennings and Lynch.  The Fiscal 2004 Form 10-K was signed by Defendants Hansen, Deehan, Jennings, Lynch and Wajnert.

39.     Furthermore, from 2000 to 2005, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating:

a.     disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants; and

11

b.    filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to the Officer Defendants.

40.    The 2000-2005 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 2000 and 2005. Defendants have been unjustly enriched at the expense of NYFIX, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

41.    The Officer Defendants breached their fiduciary duties by:

a.    colluding with the Director Defendants to backdate stock option grants;

b.    colluding with the Director Defendants to violate GAAP;

c.    colluding with the Director Defendants to violate GAAP and Section 162(m);

d.    colluding with the Director Defendants to produce and disseminate to NYFIX shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

e.    colluding with the Director Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

42.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

43.    The Committee Defendants breached their fiduciary duties by:

a.    colluding with the Officer Defendants to backdate stock option grants;

b.    colluding with the Officer Defendants to violate GAAP and Section 162(m);

c.    colluding with the Officer Defendants to produce and disseminate to NYFIX shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with the Officer Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

44.    The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

45.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred connection with the Company's restatement of historical financial statements, and costs and expenses incurred in connection with the SEC and U.S. Attorney's Office for the Southern District of New York investigations of the Company.

46.    On August 9, 2005, the Company issued a press release entitled "NYFIX To Delay Filing Of Its Second Quarter 2005 Quarterly Report On Form 10-Q" which stated, in part, as follows:

> NYFIX, INC. (NASDAQ: NYFX), A LEADER IN TECHNOLOGY SOLUTIONS for the financial marketplace, today announced that it will delay the filing of its Second Quarter 2005 Quarterly Report on Form 10-Q for the quarter ended June 30, 2005 currently due August 9, 2005. **The delay is a result of the Company's review of the information relating to its stock option grants and the related restatements of its financial**

**statements, filed on June 30, 2005**. The review was prompted by questions raised by Deloitte & Touche LLP, the Company's independent registered public accounting firm, to the Company's Audit Committee.

As previously reported by the Company, the SEC has initiated an inquiry into the Company's granting of stock options.  The Company, as directed by the Audit Committee, is working as expeditiously as possible to complete its review.

(Emphasis added.)

47.    On October 19, 2005, the Company issued a press release entitled

"NYFIX To Restate Financial Statements" which stated, in part, as follows:

NYFIX, Inc. (NASDAQ: NYFXE), a leader in technology solutions for the financial marketplace, today announced that it will restate its previously issued financial statement.

On August 9, 2005, NYFIX announced that it would delay the filing of its Second Quarter 2005 Quarterly Report on Form 10-Q for the quarter ended June 30, 2005. The delay was a result of the Company's review of information relating to its stock option grants previously restated in the financial statements, filed on June 30, 2005. The Company, as directed by its Audit Committee, has recently completed its review of the accounting for stock options and believes that non-cash compensation expense, primarily in the years 1999 to 2004, was understated by approximately $2 million. These results have not yet been reviewed by the Company's independent registered public accounting firm.

The Company expects to restate its audited financial statement for the years ended December 31, 2004, 2003 and 2002 included in its 2004 Annual Report on Form 10-K and expects to restate its unaudited results for the three months ended March 31, 2005, included in its First Quarter 2005 Quarterly Report on Form 10-Q. Inasmuch as the adjustments relate to non-cash items, the resulting restatement will have no effect on the Company's current cash position or cash flows from operations.

**The Company believes that the aforementioned restatement will constitute a material weakness under Section 404 of the Sarbanes-Oxley Act of 2002.**

(Emphasis added.)

48.    On October 27, 2005, the Company announced that its independent

auditor, Deloitte & Touche LLP had resigned.

14

49.    On October 31, 2005, the Company issued a press release entitled "NYFIX, Inc. Provides Update To Delisting And Earnings" which stated, in part, as follows:

> NYFIX, Inc. (NASDAQ: NYFXE), NYFIX a leader in technology solutions for the financial marketplace recently announced that its independent registered public accountant, Deloitte & Touche LLP, resigned. As described in the Company's Forms 8-K dated October 19 and 20, 2005, the Company has determined that it expects to restate its previously issued financial statements to recognize approximately $2 million in additional pre-tax, non-cash compensation expense primarily over a six-year period - 1999 through 2004.
>
> NYFIX is currently interviewing accounting firms and proceeding as expeditiously as possible to hire a new registered public accounting firm and to bring the Company's regulatory filings current.
>
> Nasdaq had previously provided the Company with an extension until October 31, 2005 to become current in its financial reporting. The Company will not meet this deadline. **As a result, the Company has been notified by Nasdaq that the Company's common stock will be delisted from the National Market System as of market opening on Tuesday, November 1, 2005.** The Company anticipates that, following the Nasdaq delisting, its common stock will be traded in the Pink Sheets under the Symbol NYFX.PK.
>
> The Company intends to return to the National Market System as soon as possible after it becomes current with its public filing requirements.
>
> (Emphasis added.)

50.    On March 14, 2006, the Company issued a press release entitled "NYFIX Announces Delay In Filing Its 2005 Form 10-K And SEC Staff Recommendation To Close Inquiry Into NYFIX's 2004 Restatement" which stated, in part, as follows:

> NYFIX, Inc. (Pink Sheets: NYFX). NYFIX, a leader in technology solutions for the financial marketplace, announced today that it will **delay the filing of its 2005 Annual Report on Form 10-K for the year ended December 31, 2005 currently due March 16, 2006.**
>
> The delay is a result of the previously announced ongoing review of information relating to stock option grants and the re-audit of financial statements for 2003 and 2004 by Friedman LLP, the independent

registered public accounting firm appointed by the Company's Audit Committee in November 2005. NYFIX expects to include restated prior balances in its 2005 Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q for the periods ended June 30, 2005 and September 30, 2005 to reflect additional non-cash charges related to its accounting for stock options. NYFIX presently anticipates filing these reports during April 2006, and as a result, becoming current with its periodic filing requirements.

NYFIX also announced that SEC Enforcement Staff had advised that it is recommending that the SEC close its inquiry into NYFIX's May 2004 restatement of its 1999 through 2002 consolidated financial statements without any action being taken against NYFIX or any individual. As a result of the Staff's recommendation, which is subject to a formal approval process within the SEC, NYFIX will not be required to produce any more documents or provide additional witnesses for testimony in connection with this inquiry.

(Emphasis added.)

51.    On April 28, 2006, the Company issued a press release entitled "NYFIX Announces Delay In Filing Its 2005 Form 10-K And First Quarter 2006 Form 10-Q" which stated, in part, as follows:

NYFIX, Inc. (Pink Sheets: NYFX). NYFIX, a leader in technology solutions for the financial marketplace, announced today a **further delay in the filing of its 2005 Annual Report on Form 10-K for the year ended December 31, 2005.** The Company had previously anticipated filing the 10-K during April 2006.

The Company also anticipates a delay in the filing of its Quarterly Report on Form 10-Q for the three months ended March 31, 2006, due May 10, 2006.

These delays are the result of the ongoing review of information relating to stock option grants, as described in the Company's March 14, 2006 press release, and **additional historic accounting issues which have surfaced as part of an internal review by management and the re-audit of financial statements for 2004 and 2003 by Friedman LLP,** the independent registered public accounting firm appointed by the Company's Audit Committee in November 2005.

**The additional accounting issues identified to date relate to prior investments in and acquisitions of affiliates and subsidiaries, derivative liabilities embedded within the Company's $7.5 million convertible note issued in December 2004 and certain revenue**

**recognition issues prior to 2005.** The Company's management, Audit Committee and Board expect to address accounting and other corrective action, if any, that the Company deems appropriate as the review proceeds.

NYFIX currently expects to include restated prior period amounts in its 2005 Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q, for the periods ended June 30, 2005 and September 30, 2005, to reflect additional charges related to stock option grants and to one or more of the additional accounting issues noted above.

NYFIX presently anticipates releasing financial results for the periods noted above during the second quarter of 2006, and thereafter filing with the SEC these reports and its Form 10-Q for the period ended March 31, 2006.

(Emphasis added.)

52.    On May 17, 2006, the Company announced that it received a grand jury subpoena from the United States Attorney's Office for the Southern District of New York calling for the production of all documents relating to the granting of stock options from 2000 to the present.

53.    On June 29, 2006, the Company issued a press release entitled "NYFIX Reports Unaudited Divisional Revenues for 2005 By Quarter And For The Full Year" which stated, in part, as follows:

Update on Accounting Restatements

NYFIX has substantially completed the previously announced review of historical stock option grants and is still evaluating the complex accounting implications on previously reported results. Since the accounting for common stock purchase warrants is similar to that for stock options, NYFIX expanded its review to include such awards. **NYFIX has expended significant resources as part of its process to conform its accounting for stock options and warrants to GAAP. During the year ended December 31, 2005 and the quarter ended March 31, 2006, NYFIX incurred costs of $3.1 million and $3.9 million, respectively, related to the SEC inquiries, the financial restatements and related litigation.** The Company has performed a detailed forensic review of over 1,400 awards to more than 500 grantees. At times the Company retained in excess of 60 contract lawyers and accountants combined to review hundreds of thousands of documents, such as Board and Committee meeting minutes, resolutions, schedules and emails, and meta-data for

17

such documents, to respond to SEC information requests and to determine the appropriate dates to measure the accounting impact of grants and exercises. **The Company's review has identified a number of accounting issues not previously included in the $16.4 million restatement for stock option compensation included in the 2004 Annual Report on Form 10-K. The Company expects the accounting consequences of these issues to materially exceed the $2.0 million of estimated additional stock option compensation announced in October 2005.** Some of the more significant issues include the following:

- Grants where there is insufficient basis to rely on the process and documentation to reasonably ascertain a date to measure the accounting impact.

- Grants where there was a failure to complete the option grant process by the effective date of the grant with respect to the number of shares to be issued, amounts allocated to grantees and/or the subsequent identification of new grantees.

- Grants for which there were subsequent modifications.

- Non-recourse loans issued by certain Officers and Directors for the exercise of options and warrants.

As previously announced, NYFIX will restate previously reported results for other issues in addition to stock option and warrant compensation. These issues were identified during an overall internal accounting review by management and the ongoing re-audit of financial statements for 2004 and 2003 by Friedman, LLP, the independent registered public accounting firm appointed by the Company's Audit Committee in November 2005, and include the following (all amounts unaudited):

- $4.0 million, net, in additional pre-tax charges associated with the 2002 acquisition of an initial interest in Renaissance Trading Technologies, LLC ("Renaissance") and the 2003 acquisition of the remaining interest in Renaissance not previously held by the Company. Gross charges of $2.5 million and $2.0 million for the years ended December 31, 2003 and 2002 are offset by reductions to amortization expense for an intangible asset left at cost of $0.1 million, $0.3 million and $0.2 million, respectively, for the first quarter 2005 and the full years 2004 and 2003.

- $1.6 million, net, in additional pre-tax charges associated with the 2002 acquisition of an initial interest in EuroLink Network, Inc. ("EuroLink") and the 2004 acquisition of the remaining interest in EuroLink not previously held by the Company. Of this amount, $0.1

million, $0.7 million and $0.8 million, respectively, relate to the years ended December 31, 2004, 2003 and 2002.

- $2.0 million pre-tax reversal of revenue recorded in 2001 with respect to transactions with an entity operated by substantially the same principals as EuroLink prior to the Company's initial investment in EuroLink in 2002.

- $0.9 million pre-tax net reversal of revenue recorded by the London branch office of the Company's NYFIX Overseas subsidiary related to the timing of delivery of product and service periods covered. Of this net amount, $0.1 million is an increase to revenues for the first quarter 2005, $0.4 million is a decrease to revenues for the full year 2004, $0.1 million is an increase to revenues for 2003 and $0.7 million is a decrease to revenues for the year ended December 31, 2002.

- $0.2 million pre-tax charge in the first quarter of 2005 related to the Company's $7.5 million convertible note for the amortization of the debt discount established for embedded derivatives and the fair value adjustments on those embedded derivatives.

- The Company has established a valuation allowance for deferred tax assets effective December 31, 2000. The Company had not previously reserved for deferred tax assets until the third quarter of 2004. As a result of this restatement, tax benefits of $3.7 million previously recorded through additional-paid-in capital and on acquisitions have been reversed and therefore have not been reserved for through operations. In addition, primarily because of the additional expense recorded for the losses incurred by Renaissance, a net deferred tax liability recorded through operations has been reduced by $1.2 million.

NYFIX previously only recorded a portion of the operating losses of Renaissance and EuroLink based on the percentage voting interest it held in these entities under the equity method. Since NYFIX provided substantially all of the funding for these entities through its investments and through loans and advances, historical results have been restated to absorb 100% of these operating losses. Prior to making its investment in EuroLink in March 2002, NYFIX previously recorded $2.0 million of revenue in 2001 for transactions with IMX Group, LLC ("IMX"). IMX had minimal assets other than cash from a $0.5 million loan from NYFIX and was operated by substantially all of the same principals who later operated EuroLink. The $2.0 million liability on the books of IMX was transferred to EuroLink in March 2002 and was paid to NYFIX out of the $4.0 million investment made by NYFIX in EuroLink in March 2002.